UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
SHARYLL JAFFE,

        Plaintiff,                 <u>MEMORANDUM AND ORDER</u>

   -against-                    Civil Action No.
                                     CV-06-0317 (DGT)(WDW)
SERGEANT ANNA FITZGERALD, in her
individual capacity, "C.O.
KREUTZ" in his/her individual
capacity and NEW YOUR STATE COURT
OFFICERS, JOHN AND JANE DOES 1-3,
who are known by name to the
Defendants but not fully known to
the Plaintiff in their individual
capacities,

        Defendants.

-------------------------------X

Trager, J:


    Plaintiff Sharyll Jaffe ("plaintiff") brings this action

against Court Officers Anne Fitzgerald[1] in her individual

capacity, Kenneth Kreutz in his individual capacity, James

Ferraiolo in his individual capacity and John and Jane Does 1-3

in their official capacities (collectively, "defendants").

Plaintiff's claims arise out of an altercation in Queens Family

Court in which she was subdued by the defendants after Central

Islip Family Court judge ordered her five children removed from

--------------------------------

     [1]  The correct spelling of the defendant's name is "Anne
Fitzgerald."  Fitzgerald was a sergeant at the time of the
incident but has since been promoted to lieutenant.

                         1

her custody.  Plaintiff's Third Amended Complaint ¶¶ 15-40 ("Am. Compl.").  Plaintiff claims that she is entitled to relief under 42 U.S.C. § 1983 because the defendants violated her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.  Am. Compl. ¶¶ 44-50.  Plaintiff also claims that she is entitled to relief on a state law claim for negligence.  Am. Compl. ¶¶ 54-55. Plaintiff seeks twelve million dollars ($12,000,000.00)[2] in monetary damages plus attorney's costs and fees.  Am. Compl. ¶ 60.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In their opening papers, they argue that they are entitled to summary judgment with respect to plaintiff's claims related to excessive use of force because of qualified immunity.  Defendant's Motion for Summary Judgment ("Def. Mot.") at 9.  In their reply papers, the defendants assert that they are entitled to summary judgment on the grounds of collateral estoppel and res judicata as a result of a September 25, 2007 grant of summary judgment against Plaintiff by the State of New York Court of Claims for a claim Plaintiff filed in that court regarding the same incident ("the

---

[2]  Specifically, Plaintiff is seeking: (1) four million ($4,000,000.00) for violation of her Fourth, Fifth, Eighth and Fourteenth Amendment rights; (2) four million ($4,000,000.00) for gross negligence and negligence; and (3) four million ($4,000,000.00) in punitive damages.  Am. Compl. ¶ 60.

State Court Claim").[3]  Defendant's Reply ("Def. Repl.") at 5.

For the following reasons, summary judgment is granted for the defendants in this action with respect to their claims for excessive force under the Fourth Amendment and all other claims will be dismissed on a sua sponte motion for summary judgment unless plaintiff files supplemental briefing regarding these other claims as outlined below.  In the event that plaintiff files such supplemental briefing within 21 days, the defendants will have a further 21 days to respond from the date of plaintiff's supplemental filing.

### Background

### (1)

### Plaintiff's Detention

On March 11, 2004, Plaintiff appeared in Central Islip Family Court for a hearing to determine whether her children would be removed from her custody.  Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Def. 56.1 St.") ¶ 5.  Paintiff had been in the Central Islip Family Courthouse on at least ten prior occasions.  Jaffe Dep. at 16:8-10.  Plainitff's

---

[3]The defendants' opening papers mention the judgment of the Court of Claims, see Def. Mot. at 12, but never so much as use the words "collateral estoppel" or "res judicata," let alone make arguments or reference legal authority for the application of these principles.  See Def. Mot. 1-12.

boyfriend, Darren Bradshaw, and her oldest son, Ulysseus, accompanied her to the courthouse and waited in the hallway during the proceeding. Jaffe Dep. at 25:14-15; 28:21-22. After conducting a hearing, Judge John Kelly ordered plaintiff's children removed from her custody and placed in foster care. Jaffe Dep. at 28:25. Plaintiff asked to speak to Ulysseus before his removal, but Judge Kelly denied her request. Jaffe Dep. at 29:7. Despite Judge Kelly's denial, Jaffe ran out of the courtroom to look for Ulysseus. Jaffe Dep. at 29:9-10.

When Jaffe arrived in the hallway, Bradshaw told her that Ulysseus had been taken to a small office a few feet away. Jaffe Dep. at 30:7-16; 31:16-22. Plaintiff knocked on the office door and screamed Ulysseus's name. Def. 56.1 St. ¶ 9; Jaffe Dep. at 33:14. When no one opened the office door, plaintiff ran to a nearby phone bank to call her grandmother. Jaffe Dep. at 34:10-14. When she could not reach her grandmother, Jaffe slammed the telephone receiver down. Jaffe Dep. at 32:13-14; 34:18-20; 66:17-19.

While plaintiff was on the phone, Fitzgerald, the commanding officer at the courthouse, arrived at the scene. She had been informed of the removal and ordered other officers to report to the area. Def. 56.1 St. ¶ 8; Fitzgerald Dep. at 24:22-25; 26:5-24. According to Fitzgerald, she observed plaintiff crying and screaming on the phone. Fitzgerald Dep. at 37:7; 38:2-3.

Fitzgerald says she overhead plaintiff on the telephone "telling someone to go take the kids before [Child Protective Services] could get to them." Fitzgerald Dep. at 40:6-8. After plaintiff attempted to use the phone, she ran back toward the room where her son was. Jaffe Dep. at 35:7-14. She admits that she was trying to talk to her son. Jaffe Dep. at 54:8.

At this point, accounts differ as to what occurred. Jaffe claims that there were officers on both sides of her, Jaffe Dep. at 37:3, and that one the officers tripped her. Jaffe Dep. at 35:17-18. Fitzgerald, by contrast, says that she ordered the officers present to stop plaintiff and that Jaffe "fell...." Fitzgerald Dep. at 44:3-4, 23-25. Officer Kenneth Kreutz, who was present that day, saw an officer place himself between plaintiff and the door "to prevent her from getting past him." Kreutz Dep. at 49:16-17. Plaintiff says she fell "with her hands out in front of her". Jaffe Dep. at 38:8-15.

According to plaintiff, someone put his foot on her back while she was lying on the floor. Jaffe Dep. at 43:4. At this point she began "wiggling" so that the person would remove his foot. Jaffe Dep. at 45:2-8. Jaffe was yelling. Jaffe Dep at 46:18-22. She was also "pushing [herself] up." Jaffe Dep. at 47:12-13. Her purpose was to get up so that the officer would get off her back. Jaffe Dep. at 47:17-24. The officers instructed plaintiff to "calm down, calm down." Jaffe Dep. at

39:17-18.  Bradshaw also asked plaintiff to calm down.  Jaffe Dep. at 40:3-4.  Jaffe admits the defendants did not hit, punch or kick her.  Jaffe Dep. at 48:18-25; 49:4. Jaffe estimates being on the ground for more than ten minutes.  Jaffe Dep. at 51:2-3.  She recalled there being "about 10" officers surrounding her.  Jaffe Dep. at 11:2.

At some point, the officers put handcuffs on her such that her hands were handcuffed behind her back.  Jaffe Dep. at 48:5-16.  Jaffe claims that defendants held her arms and pulled the chain on her handcuffs to lift her to her feet while one officer's foot was still on her back.  Jaffe Dep. at 50:5-13.  While this was happening, Bradshaw continued to urge Jaffe to calm down.  Jaffe Dep. at 51:10-13.

The account given by the defendants differs in important respects.  Kreutz claims plaintiff was only on the ground for "a few seconds".  Kreutz Dep. at 57:8-9.  Fitzgerald testified that "she was not down there for any length of time...."  Fitzgerald Dep. at 59:20-21.  Kreutz and Fitzgerald deny seeing an officer put his foot on Jaffe's back.  Fitzgerald Dep. at 63:4-6; Kreutz Dep. at 57:18-19; 59:3-19.  Officer Kreutz claims plaintiff was only handcuffed when she was already on her feet - not while she was on the floor.  Kreutz Dep. at 60:7-23.  Fitzgerald recalls that Jaffe was assisted up from the floor and the handcuffs were placed on her at the same time - "in one motion."  Fitzgerald

Dep. at 63:23-25. Fitzgerald indicated that officers "are not allowed to lift [an individual up by the] cuffs. If you do it is extremely painful, and she would have screamed, and she was not screaming." Fitzgerald Dep. at 58:5-8. Fitzgerald states that plaintiff was "very, very angry" and that Bradshaw was attempting to soothe her. Fitzgerald Dep. at 44:19-20; 45:14-17; 58:13-15. Kreutz claims that, as he was helping to lift Jaffe off the ground, Jaffe was trying to break out of his hold. Kreutz Dep. at 57:2-14.

After the incident was over, Fitzgerald asked the officers who were present if they had been hurt. Fitzgerald Dep. at 46:13-15. Kreutz's wrist was hurt. Kreutz Dep. 66:10. According to Kreutz, his injuries were caused by Jaffe's violent movements in trying to break free of his hold. Kreutz Dep. at 71:8-20. Kreutz did not see a doctor or go to a hospital for his injury. Kreutz Dep. at 70:17-20. Fitzgerald also asked the officers present if they wanted to press charges but they all agreed that Jaffe should not be arrested. Fitzgerald Dep. at 46:13-15. In their filings accompanying this motion, defendants claim that plaintiff could have been charged with Obstructing Governmental Administration in the Second Degree, Disorderly Conduct, and Criminal Contempt for her conduct. Def. 56.1 St. ¶ 13. Both Kreutz and Fitzgerald claim that they offered plaintiff medical attention. Kreutz Dep. at 67:3-9; Fitzgerald

Dep. at 65:19-25; 66:2-20.  Plaintiff denies she was offered
medical attention.  Jaffe Dep. at 58:10-12.

Jaffe claims to have been seriously injured as a result of
the incident.  Indeed, in her complaint, she indicates that,
among other things, she suffered "broken bones, multiple
contusions, fractures to her elbow, on-going physical pain and
discomfort, mental anguish, mental pain and suffering... [and
will] also be required to undergo future, corrective surgeries
for her arm...." Am. Compl. ¶¶ 38.  Plaintiff visited the
emergency room; Jaffe Dep. at 68:18-71:2, 89:10; her doctor;
Jaffe Dep. at 71:10-12-74:2; and two specialists; Jaffe Dep. at
80:22-81:22.  At her deposition, she described injuries such as
bruises on her back which bled; Jaffe Dep. at 64:9-11, 17; an
inability to move her left arm for a period of weeks; Jaffe Dep.
at 66:20-67:16; a hairline fracture on her lower arm; Jaffe Dep.
at 69:12-24; and problems opening and closing her hand; Jaffe
Dep. at 79:23.  She testified that the emergency room gave her
"Hydrocortone [and] Vicodin" in the immediate aftermath of the
incident, Jaffe Dep. at 70:23-24, and that thereafter she was
only prescribed Vioxx.  Jaffe Dep. at 83:23.  When deposed, she
discussed several continuing health problems, among which were
problems moving heavy objects, Jaffe Dep. at 86:21-22, problems
closing doors, Jaffe Dep. at 88:13-16, difficulty driving, Jaffe
Dep. at 92:17-21, pain when she moves her arm above her head,

Jaffe Dep. at 93:10-15, and that her hand still freezes up
sometimes, Jaffe Dep. at 87:2-4.  In her motion papers, she
claims that her injuries have prevented her from holding a job.
Plaintiff's Response at 6.

However, plaintiff admits that she returned to work within a
matter of weeks after the incident.  Jaffe Dep. at 67:15-16.[4]  She
returned to the same position she had held previously as a food
service worker and returned without any restrictions to the
duties she performed.  Jaffe Dep. at 86:5-15.  Indeed, she had
been cleared by her doctor for full duty.  Jaffe Dep. at 84:13-
16.  After returning, she worked at the same position for two
months before being let go as a result of not passing her
probationary period.  Jaffe Dep. at 58:22-23, 84:12-13.  After
losing that job, she worked at United Cerebral Palsy as a cook.
Jaffe Dep. at 10:12-23.  She worked there for two months until
March 2005 before being fired for "calling in...."  Jaffe Dep. at
11:8-12.  At the time of her deposition, she had not been
regularly employed since that time.  Jaffe Dep. at 10:3-8.  At
her deposition, she indicated that she was not taking any pain
medications for her injuries anymore and had not taken any pain
medication that day.  Jaffe Dep. at 83:34-84:4.

---

[4]At another point she indicated that she "d[idn't] know" how
much work she missed after the incident in question.  Jaffe Dep.
at 84:10.

## Procedural History

On June 10, 2004, Jaffe served a Notice of Claim on the State of New York - the first step in beginning the state court action.[5]  Court of Claims Complaint ("Ct. Cl. Comp.") ¶ 2.  The parties stipulated the Notice of Claim was to be treated as a Notice of Intention to File a Claim.  Id.  The Claim was filed on January 27, 2006. Id. at p. 13.  The State of New York was the only defendant named in the state court action.  Id. at p. 1.  In her claim, plaintiff alleged negligence, assault, battery, excessive force and false imprisonment by the New York State Court Officers named in the instant proceeding.  Id. ¶¶ 32-69.

The State of New York Court of Claims granted summary judgment for the State of New York based on the principles of judicial immunity and qualified immunity.  Court of Claims Decision ("Ct. Cl. Dec.") at 5-8.  The court found that the State of New York was entitled to judicial immunity because the court officers were enforcing a valid court order when they detained plaintiff.  In his Decision and Order dated September 25, 2007, Judge Lack wrote:

> [T]he officers were aware of the hearing and were also aware of the judge's ruling.  Admittedly, [plaintiff]

---

[5] The instant action was filed simultaneously and commensurate with the State Court Claim.

left the courtroom to violate the court's order. [plaintiff] testified she was told not to speak to her son, yet she rushed out to "get her son". In addition, [plaintiff] was overheard on the phone trying to thwart the judge's order to have the other children placed into foster care also. [plaintiff] fell while attempting to get to her son. The officers present were enforcing the judge's order of no contact between [plaintiff] and her son.

Id. at 7.

In the alternative, Judge Lack found that the State of New York was entitled to qualified immunity because the officers' actions in detaining plaintiff were objectively reasonable. Id. at 8. Plaintiff did not appeal the Court of Claims grant of summary judgment against her.

Plaintiff filed a complaint with this court on January 25, 2006. On March 31, 2008 - about six months after the decision by the New York Court of Claims - defendants moved for summary judgment. Def. Mot. 12, Ct. Cl. Dec. 8. Their opening motion papers mentioned Judge Lack's decision but did not make any explicit argument for res judicata or collateral estoppel. Id. However, in their reply papers, defendants argued for preclusion both on the basis of collateral estoppel and res judicata. Def. Repl. 5-6.

## Discussion

### (1)

### Summary Judgment Standard

Summary judgment should be granted if "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  "The moving party bears the burden of showing that he or she is entitled to summary judgment." Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005).  At the summary judgment stage, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004).  A motion for summary judgment will not be granted unless no reasonable jury could find for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### (2)

### Preclusion

Though the issue of whether plaintiff's claims are precluded by the Court of Claims ruling will be considered, neither res judicata nor collateral estoppel serve to bar plaintiff's federal

12

claims.  To be sure, the defendants failed to raise the issues of
res judicata and collateral estoppel in a timely manner.
Normally, claims of preclusion must be raised in the answer,
Fed.R.Civ.P. 8(c)(1), or, alternatively, as soon as the defense
becomes available.  See Totalplan Corp. of America v. Colborne, 14
F.3d 824, 832 (2d Cir. 1994).  In our case, defendants failed to
explicitly raise the defense in their opening papers despite the
fact that the Court of Claims decision was handed down about six
months before their opening papers were signed.  Def. Mot. 12, Ct.
Cl. Dec. 8.  Though the defendants mentioned the Court of Claims
decision, they never so much as used the words collateral estoppel
or res judicata.  Def. Mot. 1-12.  To sufficiently raise an issue,
a party must generally clearly state their claim and provide some
supporting authority.  Merely mentioning the fact that the prior
decision occurred is not sufficient.  Cf. Tolbert v. Queens
College, 242 F.3d 58, 75-76 (2d Cir.2001) ("A contention is not
sufficiently presented for appeal if it is conclusorily asserted
only in a footnote.").

However, in this case, the issue of preclusion will be
considered.  Waiver of preclusion defenses is not inflexibly
applied.  Indeed, the Second Circuit has upheld a district court
raising collateral estoppel sua sponte without even giving the
opposing party an opportunity to respond.  Curry v. City of
Syracuse, 316 F.3d 324, 330 (2d Cir. 2003) (discussing Doe v.

13

_Pfrommer_, 148 F.3d 73, 80 (2d Cir.1998)). In this case, the strong policy of securing judicial economy counsels in favor of considering defendants' preclusion arguments. It would be strange indeed to ignore a state court decision considering the same events and analyzing similar issues.

Federal courts considering whether to accord preclusive effect to a state court judgment must apply the preclusion rules of the state that handed down the judgment. _Town of Deerfield, N.Y. v. F.C.C._, 992 F.2d 420, 428-29 (2d Cir. 1993); _see also_ 28 U.S.C. § 1738. For res judicata to bar a claim in New York, there must be an identity of parties. _Ruiz v. Commissioner of Dept. of Transp. of City of New York_, 858 F.2d 898, 902 (2d Cir. 1988) (discussing New York law). Accordingly, res judicata does not apply because the State of New York was the defendant in the action in the New York Court of Claims and the state is not a defendant in this action.

With respect to collateral estoppel:

> under New York law, collateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.... Additionally, the issue that was raised previously must be decisive of the present action.

_Curry v. City of Syracuse_, 316 F.3d 324, 331 (2d Cir. 2003) (quotation and citations omitted); _see also_ _Schwartz v. Public Adm'r of Bronx County_, 24 N.Y.2d 65, 71, 246 N.E.2d 725, 729, 298

14

N.Y.S.2d 955, 960 (1969).  Also, "the issue must have been ...

essential to the [prior] decision ...."  <u>Ryan v. New York</u>

<u>Telephone Co.</u>, 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490, 478

N.Y.S.2d 823, 826 (1984).

The fact that some of plaintiff's claims in the instant

action arise under federal law - rather than the state law

theories decided by the Court of Claims - does not exclude the

possibility of applying collateral estoppel.  Though there must be

an identity of issues to apply collateral estoppel, this does not

require that claim be based on the same provision of law.  <u>Ryan v.</u>

<u>New York Telephone Co.</u>, 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490,

478 N.Y.S.2d 823, 826 (1984).  Rather it requires that

substantially the same specific legal or factual dispute was

decided in the prior action.  <u>Id.</u>

However, collateral estoppel is not appropriate because the

Court of Claims relied on two independent grounds.  The Court of

Claims found that the State of New York was not liable because its

officers enjoyed absolute judicial immunity and also because, even

in the absence of absolute judicial immunity, they would have

qualified immunity.  Ct. Cl. Dec. 6, 8.  The general rule is that

a judgment based on two independent grounds cannot serve as the

basis for collateral estoppel because neither was "essential" to

the resolution of the dispute.  Restatement (Second) of Judgments

§ 27 cmt. i.

New York recognized a limited exception to this general rule in <u>Malloy</u>. <u>See</u> <u>Malloy v. Trombley</u>, 50 N.Y.2d 46, 405 N.E.2d 213, 427 N.Y.S.2d 969 (1980). In <u>Malloy</u>, two motorists sued the state of New York in the Court of Claims for negligence arising out of an accident involving two private vehicles and a State Police car and also sued each other in Supreme Court. <u>Id.</u> at 50 N.Y.2d 46, 47-48, 405 N.E.2d 213, 427 N.Y.S.2d 969. The Court of Claims - which dealt with the case first - dismissed the negligence action against the state on two alternative grounds and extensively discussed each ground. <u>Id.</u> at 50 N.Y.2d 46, 49, 405 N.E.2d 213, 427 N.Y.S.2d 969. The Court of Appeals in <u>Malloy</u> held that preclusion was proper in the Supreme Court action - but emphasized the special "care and attention devoted to the [alternative ground] by [the Court of Claims]," the special procedural posture of the case and that the Court of Appeals was deciding the case "without intending to enunciate any broad rule...." <u>Id</u>. at 50 N.Y.2d 46, 50-51, 405 N.E.2d 213, 427 N.Y.S.2d 969 (1980). The Court of Appeals recently revisited this issue, emphasizing that <u>Malloy</u> was decided based on the "special circumstances" of the case and that <u>Malloy</u> "did not intend to enunciate any broad rule." <u>Tydings v. Greenfield, Stein & Senior, LLP.</u>, 11 N.Y.3d 195, 199, 897 N.E.2d 1044, 1047, 868 N.Y.S.2d 563, 566 (2008) (quotation and citation omitted).

In view of the limited nature of <u>Malloy</u>'s exception to the

general rule against extending preclusive effect to decisions with alternative grounds, collateral estoppel is not appropriate in this case. The special circumstances in <u>Malloy</u> are not present here.  Though the Court of Claims opinion is fairly detailed, the bulk of its legal discussion is focused on judicial immunity under New York law.  Ct. Cl. Dec. 5-7.[6]  The Court of Claims discussion of qualified immunity, though citing federal case law, is less extensive.  Ct. Cl. Dec. 6-7.  As there are no other special reasons to extend preclusive effect to the judgment of the Court of Claims, preclusion will not be applied and plaintiff's claims will be heard on the merits.

## (3)

### Qualified Immunity for the Fourth Amendment Excessive Force Claim

The defendants are entitled to qualified immunity on plaintiff's Fourth Amendment excessive force claim.  "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." <u>Wyatt v. Cole</u>, 504 U.S. 158, 167 (1992). It "serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances." <u>Lennon v. Miller</u>, 66 F.3d 416, 424 (2d Cir.

---

[6]Defendants do not raise a defense of judicial immunity in the instant case.

1995).  "A police officer is entitled to qualified immunity from
liability for his discretionary actions if either (1) his conduct
does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known... or (2) it
was objectively reasonable for him to believe that his actions
were lawful at the time of the challenged act."  Cerrone v. Brown,
246 F.3d 194, 199 (2d Cir. 2001) (citations and quotations
omitted).

     The analytical process for qualified immunity has recently
changed.  The Court laid out the old method in Saucier v. Katz,
533 U.S. 194, 200 (2001). "The first inquiry must be whether a
constitutional right would have been violated on the facts
alleged."  Id. at 200.  If a right was violated, "the next,
sequential step is to ask whether the right was clearly
established."  Id. at 201.

     However, the Court recently reconsidered this mandatory two-
step procedure in Pearson v. Callahan, 129 S.Ct. 808 (2009).  The
Court "conclude[d] that ... the sequence set forth [in Saucier]
... should no longer be regarded as mandatory.... [J]udges ...
should be permitted to exercise their sound discretion in deciding
which of the two prongs of the qualified immunity analysis should
be addressed first...."  Id. at 818.  "In effect, Pearson gives
courts additional discretion in deciding the issue of qualified
immunity without a lengthy analysis of whether there was in fact a

constitutional violation." <u>Kercado-Clymer v. City of Amsterdam</u>,
2009 WL 236063, No. 6:07-CV-00086 (NPM/DEP), at 11 (N.D.N.Y. Jan.
30, 2009); <u>see also</u> <u>Mitchell v. Kugler</u>, No. 07 CV 1801(JG)(LB),
2009 WL 160798, at *8 (E.D.N.Y. Jan. 23, 2009) (deciding only the
issue of qualified immunity).

In analyzing an excessive force claim under the Fourth
Amendment, the crucial question regarding the constitutionality of
the action is whether the force used was "reasonable." <u>Graham v.
Connor</u>, 490 U.S. 386, 296 (1989). Applying this test "requires
careful attention to the facts and circumstances of each
particular case, including the severity of the crime at issue,
whether the suspect poses an immediate threat to the safety of the
officers or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight." <u>Id.</u> "The calculus of
reasonableness must embody allowance for the fact that police
officers are often forced to make split-second judgments-in
circumstances that are tense, uncertain, and rapidly
evolving-about the amount of force that is necessary in a
particular situation." <u>Id.</u> at 396-97. Qualified immunity is
appropriate "if officers of reasonable competence could disagree
on the legality of the defendant's actions." <u>Salim v. Proulx</u>, 93
F.3d 86, 91 (2d Cir. 1996)(quotations omitted).

The defendants are entitled to qualified immunity. Plaintiff
was attempting to violate a court order issued for the protection

of a child.  Moreover, she was extremely agitated and was often physically resisting the officers.  Though she makes one somewhat disturbing allegation regarding the officers' conduct, none of her claims create a genuine issue for trial as to the defendants' liability.

Prior to her contact with the officers, plaintiff was acting in an extremely disruptive manner.  She admits that she was in the process of attempting to disobey a court order instructing her that she could not have contact with her son.  Indeed, she said at her deposition that she had run out of the courtroom, found an office where she thought her son was being held and banged on the door screaming his name.  Though it is not clear how much of this conduct the officers saw, it at least indicates the state Jaffe was in when they first did see her.  She was quite candid that, at the time she encountered the officers, she was running toward the room where she thought her son was and was trying to talk to him.

The first thing the officers did was to subdue plaintiff.  Their actions in doing so were eminently reasonable.  In plaintiff's version of events, one of the officers tripped her as she was running toward the room where she thought her son was.  Though the officers dispute that they tripped her, even if they had, they would not have acted unreasonably.  Plaintiff was in an highly emotional state, running toward the office and admittedly attempting to violate a court order.  It was reasonable for the

officers to try to stop her.  It is unfortunate that she was
tripped rather than being subdued by some other method.  But given
that the officers had to make a split-second decision under
difficult circumstances, there is nothing about their actions thus
far that was unreasonable.

Next, the officers attempted to control plaintiff after she
was brought to the ground.  Plaintiff admits that she resisted the
officers.  In her version of events, when someone put their foot
on her back, she began wiggling and yelling.  She admits that she
was pushing herself up - indeed trying to get up so the officer
would get his foot off her back.  The officers and her boyfriend
tried to get her to calm down.  She said she was on the ground for
ten minutes.  Despite her behavior, the police officers never hit,
punched or kicked her.

Plaintiff, however, also alleges that the officers handcuffed
her hands behind her back and that they pulled the chain on her
handcuffs to lift her to her feet while an officer still had his
foot on her back.  Fitzgerald said that the officers did not do
this and indeed that such an action would not be allowed.  Of
course, for purposes of summary judgment, it must be assumed that
the officers acted as plaintiff says and that this was contrary to
procedure as Fitzgerald indicated.

Plaintiff also claims to have been so seriously injured as a
result of the event that she can no longer hold down a job.

Though she presents evidence of significant injuries, there is also countervailing evidence that places an outer bound on how badly a reasonable jury could find that she was hurt. She has submitted evidence regarding bleeding bruises, a series of doctor visits and continuing problems with her left arm and one of her hands. This, in combination with her deposition testimony regarding continuing impairments to some life activities, could lead a reasonable jury to believe that she suffered substantial injuries. However, she also admitted returning to work within a matter of weeks after the incident to the same position she held before and that she returned to work without any restrictions. Indeed, a doctor cleared her for full duty. Plaintiff also stated that she was not taking pain killers at the time she was deposed.

Taken together, the facts indicate that the officers are entitled to qualified immunity. Nearly all the actions the officers took were eminently reasonable given plaintiff's behavior. Even if they did pull plaintiff up by her handcuffs while an officer had his foot on her back, this was, at worst, a reasonable mistake. On plaintiff's version of events, there were many officers involved in subduing her and all had been struggling with an agitated and highly resistant individual for some time.[7]

_____

[7]To be sure, defendants Kreutz and Fitzgerald testified that Jaffe was on the floor for only a very short period of time; Kreutz Dep. at 57:8-9, Fitzgerald Dep. at 59:20-21; while plaintiff said she was on the floor for more than ten minutes. Jaffe Dep. At 51:2-3. One could argue that, in this respect, the

Up to that point, they had done nothing that was even questionable despite the difficulty and confusion inherent in the situation. To the extent that their conduct was not ideal in raising plaintiff to her feet, it was, at worst, a reasonable error. Though plaintiff's injuries may be significant, no reasonable jury could find that they are so severe as to deprive the officers of qualified immunity.  Accordingly, defendants are entitled to qualified immunity and summary judgment in their favor is granted on the Fourth Amendment claim for excessive force.

### (4)

### Negligence, Eighth Amendment and Fourteenth Amendment Claims

Though the defendants do not address plaintiff's claims for violations of her rights under the Eighth Amendment, Fourteenth Amendment and for state law negligence, these claims will be dismissed on a sua sponte motion for summary judgment unless the plaintiff submits supplemental briefing within 21 days of the date of this order.  See Bridgeway Corp. v. Citibank, 201 F.3d 134, 139-41 (2d Cir. 2000) (noting that it is the preferable practice

---

defendants' account may actually be more advantageous for plaintiff than her own.  Arguably, a shorter encounter might involve less struggle and difficulty than a longer one, making the officers actions in lifting plaintiff to her feet less understandable.  However, even if plaintiff was on the floor only for a short period of time, the defendants' actions would still be reasonable.  Such a short encounter would remove any time for reflection and an officer might reasonably and instinctually employ a procedure under pressure that he might not otherwise.

to give a party notice before dismissing a claim sua sponte).

Should plaintiff submit such briefing, the defendants will have 21 days to respond from the date of plaintiff's submission.

Plaintiff's Eighth Amendment claims do not lie because she was not a convicted prisoner. "[T]he Eighth Amendment's protection does not apply until after conviction and sentence...." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (quotation omitted). Accordingly, absent the further filing from plaintiff noted above, her Eighth Amendment claims will be dismissed. Similarly, excessive force claims must generally be brought under the Fourth Amendment rather than the Fourteenth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989). ("[A]ll claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.") Accordingly, this claim will also be dismissed absent a further filing from plaintiff.

In the event that the Eighth Amendment and Fourteenth Amendment claims are dismissed, plaintiff's state law negligence claim will be dismissed as well. Should the Eighth Amendment and Fourteenth Amendment claims be dismissed, there will be no federal claims remaining in the action. In that event, jurisdiction under 28 U.S.C. § 1367 is discretionary. Kolari v. New

<u>York-Presbyterian Hosp.</u>, 455 F.3d 118, 121-22 (2d Cir. 2006).

Normally, the balance of relevant considerations favors dismissing

the case.  <u>Id.</u> at 122.  As there appears to be no compelling

reason to retain jurisdiction, the negligence claim will be

dismissed without prejudice to refiling in state court in the

event that no further filing is forthcoming from plaintiff.

## Conclusion

For the aforementioned reasons, the defendants' motion for summary judgment is granted with respect to plaintiff's Fourth Amendment claim for excessive force. Plaintiff's Eighth Amendment, Fourteenth Amendment and state law negligence claims will be dismissed unless she submits supplemental briefing within 21 days of the date of this order. Should such briefing be submitted, the defendants will have a further 21 days from the date of plaintiff's submission to submit further briefing of their own.


Dated:     Brooklyn, New York
           March 27, 2009

                          SO ORDERED:


                          _____/s/_____
                          David G. Trager
                          United States District Judge